Patrick L. Rocco (PR 8621)
Jennifer A. Sullivan (JS 6957)
**SHALOV STONE & BONNER LLP**
163 Madison Avenue
P.O. Box 1277
Morristown, New Jersey 07962-1277
(973) 775-8997

*Liaison Counsel*

Jerome M. Congress
Janine L. Pollack
Michael R. Reese
 **MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

*Lead Counsel for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re FRANKLIN MUTUAL FUNDS FEE LITIGATION | ) ) ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) |

MASTER FILE: 04-cv-982 (WJM) (RJH)

Document Filed Electronically

**CONSOLIDATED AMENDED COMPLAINT**

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included interviews with persons with knowledge of the conduct complained

of herein and a review of United States Securities and Exchange Commission ("SEC") filings, as

well as other regulatory filings, reports, advisories, press releases, media reports, news articles,

academic literature and academic studies.  Plaintiffs believe that substantial additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.

1

## INTRODUCTION

1.     This is a federal class action based upon the actions of Franklin Resources, Inc. ("Franklin"), and those of its subsidiaries and affiliates also named herein as Defendants, charging Franklin mutual fund investors excessive fees and expenses that they then used, in part, to improperly pay and induce brokers to steer more investors into Franklin and Templeton[1] Mutual Funds ( collectively the "Franklin Funds"of "Funds").  As a result of their material omissions and conduct detailed below, Defendants are liable under the Investment Advisers Act of 1940 (the "Investment Advisers Act"); the Investment Company Act of 1940 (the "Investment Company Act"); New Jersey's consumer fraud law; unjust enrichment; and for breaches of their common law fiduciary duties to a class (the "Class") of all persons or entities who held one or more shares of Franklin Funds, set forth in Exhibit A hereto, during the period March 2, 1999 to November 17, 2003 (the "Class Period").

2.     In essence, Defendants made undisclosed payments to brokers to induce them to direct investors into Franklin Funds.  Then, once invested in one or more of the Franklin Funds, the investors were charged and paid undisclosed excessive fees to Defendants that were used, in part, by Defendants to improperly pay brokers to push Franklin Funds on yet more investors in order to increase the level of investments in Franklin Funds.

3.     Defendants' practice of charging excessive fees and commissions to Franklin Funds investors to pay and induce brokers to steer investors into Franklin Funds necessarily created insurmountable conflicts of interest for the brokers who were purportedly acting in the best interests of their clients – but, in fact, were only concerned with their pay-offs from Franklin.

---

[1]  Templeton mutual funds were acquired by Franklin in 1992.

4.      The practice of charging excessive fees and commissions also created an insurmountable conflict of interest for the investment advisers to the Franklin Funds who had a duty to act in the best interests of fund investors, but were, in fact, only concerned with siphoning fees from Franklin Funds investors to induce brokers to artificially increase the amount of investments in Franklin Funds.  Franklin was motivated to engage in this undisclosed plan of charging excessive fees to induce brokers to steer investors into Franklin Funds because the fees it collected for managing and advising the Franklin Funds were calculated as a percentage of assets under management and, therefore, tended to increase as the number of Franklin Funds investors grew.

5.      Defendants were motivated to make these secret payments to brokerages because their fees were calculated as a percentage of funds under management and, therefore, increased as the number of Franklin Funds investors grew.  For example, as stated in Franklin's annual report on Form 10-K filed with the SEC for fiscal year ended September 30, 2003, "[i]nvestment management fees increased…in fiscal 2002 ***primarily due to increased net sales, which increased assets under management.***"  [emphasis added].  Moreover, Franklin's revenue were based almost entirely on these fees, and its very existence depended on the collections of these fees.  And even though Defendants attempted to justify this conduct on the ground that by increasing the Franklin Funds assets they were creating economies of scale that inured to the benefit of investors, in truth and in fact, however, Franklin Funds investors received none of the benefits of these purported economies of scale.  Rather, fees and costs associated with the Franklin Funds steadily increased during the Class Period, in large part because the Defendants continued to skim from the assets of Franklin Funds investors to finance their kickback scheme to brokers.

6.      The truth about Franklin finally emerged on November 17, 2003, when the SEC and the National Association of Securities Dealers ("NASD") fined and sanctioned the brokerage house Morgan Stanley for, among other wrongdoing, accepting Defendants' impermissible payments in exchange for aggressively pushing Franklin Funds over other funds.  The SEC stated that "this matter arises from Morgan Stanley DW's failure to disclose adequately certain material facts to its customers . . . [namely that] it collected from a select group of mutual fund complexes amounts in excess of standard sales loads and Rule 12b-1 trail payments."  The SEC concluded that such conduct violated Section 17(a)(2) of the Securities Act of 1933 (the "Securities Act"), among other statutes, that prohibits one from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  http://www.sec.gov/litigation/admin/33-8339.htm.

7.      In the NASD news release announcing the action it had taken against Morgan Stanley regarding, among other wrongdoing, the improper payments Morgan Stanley had received from Franklin, the NASD likewise stated the following:

> [t]his extra compensation paid to Morgan Stanley for the preferential treatment included millions of dollars paid by the mutual funds through commissions charged by the firm for trades it executed for the funds.  These commissions were sufficiently large to pay for the special treatment, as well as the costs of trade execution.

The NASD then concluded that the payments at issue here violated NASD Rule 2830 that prohibits the type of directed brokerage paid by Franklin:

> This conduct violates NASD's "Anti-Reciprocal Rule", Conduct Rule 2830(k), which prohibits members from favoring the distribution of shares of particular mutual funds on the basis of brokerage commissions to be paid by the mutual fund companies.

http://www.nasdr.com/news/pr2003/release_03_051.html; *see also* NASD Rule 2830(k).

4

8.      Pursuant to the SEC's investigation of Morgan Stanley and Franklin, Franklin has announced that as of November 28, 2003, Franklin has stopped making directed brokerage payments to brokerages in exchange for "shelf-space" arrangements whereby the brokerages would push Franklin Funds.  *See* Franklin 10-Q for the period ending March 31, 2004 at 14.  In enforcement actions to date against Morgan Stanley and Massachusetts Financial Services, the SEC has condemned the practices of directed brokerage such as that used by Franklin.  Moreover, Franklin's admission regarding directed brokerages and its promise to stop the practice of directed brokerage, however, does nothing to remedy the millions of dollars investors have lost that Defendants improperly used as directed brokerage during the Class Period.

9.      Additionally, Franklin has also admitted that its practices of paying brokers to push its mutual funds are currently being vigorously investigated by numerous federal and state agencies including the SEC, the U.S. Attorney for the Northern District of California, the New York Attorney General, the California Attorney General, the U.S. Attorney for the District of Massachusetts, the Florida Department of Financial Services and the Commissioner of Securities, the West Virginia Attorney General and the NASD, among others.  Franklin has also admitted that the SEC has alerted it that the SEC is considering bringing charges against Franklin because of what it has uncovered pursuant to its investigation of Franklin.  Likewise, the California Attorney General's Office is also expected to bring charges against Franklin for the conduct alleged herein.  *See* September 15, 2004 California Attorney General's Office press release discussing investigation of Franklin.

10.     As summed up by Senator Peter Fitzgerald (R-Ill.) after the SEC uncovered the improper conduct between Morgan Stanley and Franklin: "the mutual fund industry is indeed the world's largest skimming operation," tantamount to "a $7-trillion trough" exploited by "fund

5

managers, brokers and other insiders." *See* January 28, 2004 *Los Angeles Times – Senate Panel Chides Fund Industry* at C-4.

## JURISDICTION AND VENUE

11.  The claims asserted herein arise under and pursuant to Sections 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a), Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, 80b-15, N.J.S.A. 56:8-1 et seq., and the common law.

12.  This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14;  28 U.S.C. 1331; 28 U.S.C. 1367(a); and 28 U.S.C. § 1391(b).

13.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.  Defendants Franklin Mutual Advisers, LLC ("Franklin Mutual Advisers") and Franklin Advisory Services, LLC ("Franklin Advisory Services") were at all relevant times, and still are, headquartered in this District.

14.  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

15.  Plaintiff Stephen R. Alexander IRA held during the Class Period and continues to own shares or units of the Templeton Foreign Fund and has been damaged by the conduct

alleged herein.  Stephen R. Alexander also held during the Class Period shares or units of the

Mutual European Fund, Templeton Global Income Fund, Templeton Dragon Fund, Inc. and the

Franklin Income Fund.  A copy of Mr. Alexander's verification is attached hereto as Exhibit B.

16.     Plaintiff Frank Tricarico held during the Class Period and continues to own shares

or units of the Franklin Income Fund and has been damaged by the conduct alleged herein.  A

copy of Mr. Tricarico's verification is attached hereto as Exhibit B.

17.     Plaintiff Cathy Wilcox held during the Class Period and continues to own shares

or units of the Franklin Mutual Discovery Fund and has been damaged by the conduct alleged

herein.

### The Parent Company

18.     Defendant Franklin is a California-based corporation and maintains its corporate

headquarters at One Franklin Parkway, Building 920, San Mateo, California 94403.  Franklin,

through its subsidiaries, provides retail and institutional asset management services throughout

the world under the trade name Franklin Templeton Investments.  Franklin is the ultimate parent

of all of the defendants bearing the Franklin and/or Templeton names.  As of September 30,

2003, Franklin had $301.9 billion in assets under management with approximately 14.2 million

billable shareholder accounts worldwide.  Franklin securities trade on the New York Stock

Exchange under the symbol "BEN."

### The Investment Advisers

19.     Defendant Franklin Advisers, Inc. ("Franklin Advisers") is registered as an

investment adviser under the Investment Advisers Act and, along with the other Investment

Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the

Class Period.  During this period, Franklin Advisers, along with the other Investment Adviser

Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds. Franklin Advisers is located at One Franklin Parkway, San Mateo, California 94403.

20.     Defendant Templeton/Franklin Investment Services, Inc. ("Templeton/Franklin Investment"), is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Templeton/Franklin Investment, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Templeton/Franklin Investment is located at One Franklin Parkway, San Mateo, California 94403.

21.     Defendant Franklin Private Client Group, Inc. ("Franklin Private Client") is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Franklin Private Client, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Franklin Private Client is located at One Franklin Parkway, San Mateo, California 94403.

22.     Defendant Franklin Mutual Advisers is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Franklin Mutual Advisers, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Franklin Mutual Advisers is located at 51 John F. Kennedy Parkway, Short Hills, New Jersey 07078.

23.     Defendant Templeton Global Advisors Limited ("Templeton Global Advisors") is registered as an investment adviser under the Investment Advisers Act and, along with the other

Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Templeton Global Advisors, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Templeton Global Advisors is located at Lyford Cay, Nassau, Bahamas.

24.    Defendant Franklin Investment Advisory Services, Inc. ("Franklin Investment Advisory Services") is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Franklin Investment Advisory Services, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Franklin Investment Advisory Services is located at 777 Mariners Island Blvd., San Mateo, CA 94404.

25.    Defendant Fiduciary International, Inc. ("Fiduciary International") is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Fiduciary International, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Fiduciary International is located at 600 Fifth Ave., New York, NY 10020.

26.    Defendant Franklin Advisory Services is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Franklin Advisory Services, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Franklin Advisory Services is located at One Parker Plaza, 16th Floor, Fort Lee, NJ 07024.

27.     Defendant Templeton Investment Counsel, LLC ("Templeton Investment Counsel") is registered as an investment adviser under the Investment Advisers Act and, along with the other Investment Adviser Defendants (as defined herein), managed and advised the Franklin Funds during the Class Period.  During this period, Templeton Investment Counsel, along with the other Investment Adviser Defendants, was responsible for overseeing the day-to-day management of the Franklin Funds.  Templeton Investment Counsel is located at 500 East Broward Boulevard, Suite 1500, Fort Lauderdale, FL 33394.

28.     Franklin Advisers, Templeton/Franklin Investment, Franklin Private Client, Franklin Mutual Advisers, Templeton Global Advisors, Franklin Investment Advisory Services, Fiduciary International, Franklin Advisory Services, and Templeton Investment Counsel are herein collectively known as the "Investment Adviser Defendants."  Investment management fees payable to the Investment Adviser Defendants are calculated as a percentage of fund assets under management.

### The Distributors

29.     Defendant Franklin/Templeton Distributors, Inc. ("Franklin Templeton Distributors"), a wholly-owned subsidiary of Franklin, acts as the principal underwriter and distributor of shares of most of Franklin's U.S.-registered open-end mutual funds.

30.     During fiscal year 2003, Defendant Templeton/Franklin Investment Services ("TFIS") served as principal underwriter and distributor for several of the Franklin Funds. Franklin earns its underwriting and distribution fees primarily by distributing the Franklin Funds pursuant to distribution agreements between Franklin Templeton Distributors or TFIS and the Franklin Funds.

31.     Defendant Franklin Templeton Distributors and TFIS are referred to collectively herein as the "Distributor Defendants."

10

**The Directors, Officers and Trustees of the Franklin Funds**

32.     Defendant Harris J. Ashton ("Ashton") was a Director of at least 120 of the Franklin Funds or the portfolios in which they invested during the Class Period.  For his service as a Director overseeing the Franklin Funds, Ashton received compensation of $372,100 for the calendar year ended December 31, 2002.  Ashton's business address is 500 East Broward Blvd., Suite 2100, Fort Lauderdale, FL 33394-3091.

33.     Defendant S. Joseph Fortunato ("Fortunato") was a Director of at least 130 of the Franklin Funds or the portfolios in which they invested during the Class Period.  For his service as a Director overseeing the Franklin Funds, Fortunato received compensation of $372,941 for the calendar year ended December 31, 2002.  Fortunato's business address is 500 East Broward Blvd., Suite 2100, Fort Lauderdale, FL 33394-3091.

34.     Defendant Andrew H. Hines, Jr. ("Hines") was a Director of at least 25 of the Franklin Funds or the portfolios in which they invested during the Class Period.  For his service as a Director overseeing the Franklin Funds, Hines received compensation of $209,500 for the calendar year ended December 31, 2002.  Hines' business address is 500 East Broward Blvd., Suite 2100, Fort Lauderdale, FL 33394-3091.

35.     Defendant Betty P. Krahmer ("Krahmer") was a Director of at least 20 of the Franklin Funds or the portfolios in which they invested during the Class Period.  For her service as a Director overseeing the Franklin Funds, Krahmer received compensation of $142,500 for the calendar year ended December 31, 2002.  Krahmer's business address is 500 East Broward Blvd., Suite 2100, Fort Lauderdale, FL 33394-3091.

36.     Defendant Gordon S. Macklin ("Macklin") was a Director of at least 130 of the Franklin Funds or the portfolios in which they invested during the Class Period.  For his service as a Director overseeing the Franklin Funds, Macklin received compensation of $363,512 for the

11

calendar year ended December 31, 2002.  Macklin's business address is 500 East Broward Blvd.,
Suite 2100, Fort Lauderdale, FL 33394-3091.

37.     Defendant Fred R. Milsaps ("Milsaps") was a Director of at least 25 of the
Franklin Funds or the portfolios in which they invested during the Class Period.  For his service
as a Director overseeing the Franklin Funds, Milsaps received compensation of $219,500 for the
calendar year ended December 31, 2002.  Milsaps' business address is 500 East Broward Blvd.,
Suite 2100, Fort Lauderdale, FL 33394-3091.

38.     Defendant Nicholas F. Brady ("Brady") was a Director of at least 60 of the
Franklin Funds or the portfolios in which they invested during the Class Period.  For his service
as a Director overseeing the Franklin Funds, Brady received compensation of $140,500 for the
calendar year ended December 31, 2002.  In the past five years, Brady also served as Director of
Templeton Capital Advisors Ltd., which serves as investment manager to certain of the Franklin
Funds.  Brady's business address is 500 East Broward Blvd., Suite 2100, Fort Lauderdale, FL
33394-3091.

39.     Defendant Charles B. Johnson was a Director of at least 130 of the Franklin Funds
or the portfolios in which they invested during the Class Period.  In the past five years, Charles B.
Johnson also served as Chief Executive Officer and Chairman of the Board of Franklin and Vice
President of Franklin Templeton Distributors, Inc.  Charles B. Johnson's business address is One
Franklin Parkway, San Mateo, CA 94403.

40.     Defendant Rupert H. Johnson, Jr. was a Director of at least 110 of the Franklin
Funds or the portfolios in which they invested during the Class Period.  In the past five years,
Rupert H. Johnson, Jr. served as Vice Chairman of Franklin, Vice President and Director of
Franklin Templeton Distributors, Inc., Director of Franklin Advisers, Inc. and Franklin
Investment Advisory Services, Inc. and Senior Vice President of Franklin Advisory Services,

12

LLC.  Rupert H. Johnson, Jr.'s business address is One Franklin Parkway, San Mateo, CA 94403-1906.

41.     Defendants Ashton, Fortunato, Hines, Krahmer, Macklin, Milsaps, Brady, Charles B. Johnson and Rupert H. Johnson, Jr. are collectively referred to herein as the "Director Defendants."

**The Franklin Funds**

42.     Nominal defendants the Franklin Funds, as identified on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of directors charged with representing the interests of the shareholders in one or a series of the funds.  The Franklin Funds offer multiple classes of shares, with each class representing a *pro rata* interest in each Franklin Fund.  Franklin Fund shares are issued to Franklin Fund investors pursuant to Prospectuses that must comply with the federal securities laws, including the Investment Company Act.

43.     All of the Franklin Funds, and their corresponding portfolios, are essentially alter egos of one another as the Franklin Funds are mainly pools of investor assets that are managed and administered by officers and employees of Franklin and its subsidiaries, not by Fund employees who are independent of Franklin.  The Franklin Funds share common Boards of Directors and defendant Charles B. Johnson served as the Chairman of each Board of Directors. Officers and employees of Franklin and its subsidiaries administer the Franklin Funds generally and are not limited to individual Franklin Funds.  Individual Franklin Funds have no independent will and are totally dominated by Franklin and the common body of directors established by Franklin.  In substance, the Franklin Funds function as components of one unitary organization.

44.     The Franklin Funds share common investment advisers and share the same principal underwriters and distributors.  Additionally, Franklin pools together fees and expenses

collected from Franklin/Templeton Fund investors, resulting in the Franklin Funds sharing

expenses with one another.  For instance, the February 1, 2003 Statement of Information ("SAI")

for the Franklin Income Fund is identical in substance to the SAIs filed by the other Franklin

Funds during the Class Period.  The Franklin Income Fund SAI describes in the following terms

how costs for research services, alleged herein to be excessive, are commingled and shared by

the various Funds:

> It is not possible to place a dollar value on the special executions or on the research services the manager receives from dealers effecting transactions in portfolio securities. The allocation of transactions to obtain additional research services allows the manager to supplement its own research and analysis activities and to receive the views and information of individuals and research staffs of other securities firms. As long as it is lawful and appropriate to do so, *the manager and its affiliates may use this research and data in their investment advisory capacities with other clients.*

[Emphasis added.] *See also* March 1, 2003 Templeton Pacific Growth Fund SAI at 21.

45.     The Franklin Funds are named as nominal defendants to the extent that they may

be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil

Procedure and to the extent necessary to ensure the availability of adequate remedies.

**The John Doe Defendants**

46.     The true names and capacities of defendants sued herein as John Does 1 through

100 are other active participants with the above-named participants whose identities have yet to

be ascertained.

## SUBSTANTIVE ALLEGATIONS

## DEFENDANTS IMPROPERLY USED THE ASSETS OF
## FRANKLIN FUND INVESTORS TO UNDULY INFLUENCE BROKERS TO PUSH
## THE FRANKLIN FUNDS ON UNWITTING INVESTORS

### Defendants Used Directed Brokerage, Revenue-Sharing and Other Improper Means to Acquire "Shelf-Space" at Brokerages

47.     Unbeknownst to Plaintiffs and other members of the Class, Franklin used the assets of its mutual fund investors to pay various brokerages including, but not limited to, Morgan Stanley, Merrill Lynch, Salomon Smith Barney, A.G. Edwards and Wachovia Securities to aggressively push Franklin mutual funds on unwitting investors.  Franklin made these payments through a variety of means including: (a) directing the trades – and the lucrative commissions – in the securities and other investment sof the underlying investment portfolios of the Franklin Funds to these brokerages ("directed brokerage"); paying cash and other inducements to these brokerages ("revenue-sharing"); and, paying excessive commissions, including but not limited to, improper "soft dollars" as defined below.

48.     Franklin's practice of paying brokerages to aggressively push Franklin Funds was known as buying "shelf-space" at these brokerages.  According to a former Franklin analyst who worked at Franklin during the Class Period, Franklin paid major brokerage houses such as Morgan Stanley and Merrill Lynch for "shelf-space."  Pursuant to these "shelf-space" program agreements, brokers steered unknowing clients into Franklin Funds because the brokers were paid more for Franklin Funds than for other mutual funds.

### Franklin's Improper "Shelf-Space" Arrangement With Morgan Stanley

49.     According to internal Morgan Stanley documents as well as former Morgan Stanley brokers who worked for Morgan Stanley during the Class Period, the "shelf-space" program in which Franklin participated at Morgan Stanley was called the "Asset Retention Program" which was later renamed the "Partners Program." ("Morgan Stanley Shelf-Space

Program").  The Morgan Stanley Shelf-Space Program was nothing more than a series of veiled payments by Franklin to Morgan Stanley to steer investors into Franklin Funds.  ***Under the Morgan Stanley Shelf-Space Program, Morgan Stanley brokers improperly pushed Franklin Funds on unwitting clients because they received more money to do so.***  According to Morgan Stanley internal documents, Franklin paid millions of dollars during the Class Period in directed brokerage and other means as part of the *quid pro quo* arrangement with Morgan Stanley to participate in the Morgan Stanley Shelf-Space Program.  In numerous enforcement actions to date, such payments have been condemned by the SEC as being improper and creating conflicts of interest that were not properly disclosed to investors.

50.     Through the Morgan Stanley Shelf-Space Program, Franklin also paid excessive commissions to Morgan Stanley brokers to induce them to sell Franklin Funds.  According to former Morgan Stanley brokers and internal Morgan Stanley documents, pursuant to the Morgan Stanley Shelf-Space Program, Morgan Stanley adopted a broker "Incentive Compensation" payout grid that provided up to 3% greater compensation for "asset-based products" versus "transaction-based products."  Franklin Funds were classified as "asset-based products," while non-Shelf Space Program funds were classified as "transaction-based products" and resulted in a smaller payout to the brokers.

51.     Due to the improper inducements paid by Franklin, Morgan Stanley's management made it clear through firm-wide memos that it wanted its brokers to take advantage of the payout grid by directing investors into Franklin Funds.  As stated by Bruce Alonso, the managing director of Morgan Stanley's Investor Advisory Services Division, in a firm-wide message entitled "An Important Message From Bruce Alonso Regarding the 2003 Compensation Plan" circulated throughout Morgan Stanley in December 2002:  "the recently announced 2003

Compensation Plan provides you with the opportunity to increase your overall compensation by focusing on asset-based products," *i.e.,* Franklin Funds.

52. Under the compensation grid discussed above, for instance, a broker whose annual production was over $1 million received 42% of the commissions on "asset-based products" and 40% of the commissions on "transaction-based products." Accordingly, brokers generally received a higher payout from the sale of the Franklin Funds than non-Partner Program mutual funds.

53. Additionally, in order to further push Franklin Funds and reap the benefits of the extra inducements from Franklin, Morgan Stanley management gave Franklin Funds priority placement in the review of fund materials to be distributed to Morgan Stanley brokers; gave Franklin access to Morgan Stanley's branch system at the branch managers' discretion; gave Franklin direct access to Morgan Stanley brokers; included Franklin in Morgan Stanley broker events; and invited Franklin to participate in programs broadcasted to brokers over Morgan Stanley's internal systems.

### The Fine and Censure of Morgan Stanley for its Involvement with Franklin

54. Morgan Stanley is just one of the brokerage houses to which Franklin made improper inducement payments in order to have Franklin Funds pushed on investors. For its role in accepting these payments from Franklin, among other wrongdoing, Morgan Stanley has been fined and censured by the SEC and NASD and has agreed to pay fines totaling $50 million. On November 17, 2003, the SEC issued a press release (the "November 17 SEC Release") that announced:

> the institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) for failing to provide customers important information relating to their purchases of mutual fund shares. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of

which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.

> ***Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds.*** To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch managers on sales of those funds' shares.  The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.  [. . .]

*Id.* [emphasis added.]

55.     The November 17 SEC Release further stated:

> The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.  Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities.  Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction.  The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

> *        *        *

> In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes.

> Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

> *        *        *

> The NASD also announced today a settled action against Morgan
> Stanley for violations of NASD Rule 2830(k) arising from the
> Partners Program and its predecessor.

*Id.*

56.     With respect to the "shelf-space" program involving Franklin discussed above,

Stephen M. Cutler, Director of the SEC's Division of Enforcement, stated that unbeknownst to

investors in the Franklin Funds,  "Morgan Stanley received monetary incentives [from Franklin]

-- in the form of "shelf-space" payments -- to sell particular mutual funds [*i.e.,* the Franklin

Funds] to its customers.  When customers purchase mutual funds, they should understand the

nature and extent of any conflicts of interest that may affect the transaction."

57.     In fining and censuring Morgan Stanley, the SEC stated that the shelf-space

program of which Franklin was a participant violated Section 17(a)(2) of the Securities Act.

Section 17(a)(2) expressly prohibits:

> [T]he use of any means or instruments of transportation or
> communication in interstate commerce or by the use of the mails,
> directly or indirectly…to obtain money or property by means of
> any untrue statement of a material fact or any omission to state a
> material fact necessary in order to make the statements made, in
> light of the circumstances under which they were made, not
> misleading.

58.     The investigation by the SEC and NASD and the resulting settlement with the

first target, Morgan Stanley, has received wide praise, including from members of Congress.  As

stated by Sen. Peter Fitzgerald (R-Ill.) who is leading a Congressional inquiry of the mutual

funds industry:

> The settlement goes to show that the mutual fund managers as well
> as broker dealers have too often viewed mutual fund shareholders
> as sheep to be sheared.  Congress has to figure out the variety of
> ways people are being sheared so that we can stop it.

Brook A. Masters and Kathleen Day, *Morgan Stanley Settles with SEC, NASD; Firm Accused of Failing to Disclose Funds' Payments*, THE WASHINGTON POST, Nov. 18, 2003, at E1.

**The Investigation of Franklin Continues**

59.     On January 14, 2004, *The Wall Street Journal* published an article under the headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers," citing "a person familiar with the investigation," which stated that the SEC is "close to filing its first charges against mutual-fund companies related to arrangements that direct trading commissions to brokerage houses that favor those fund companies' products . . . ."  The article stated in pertinent part as follows:

> ***The SEC has been investigating the business arrangements between fund companies and brokerage houses since last spring.***  It held a news conference yesterday to *announce **it has found that widespread evidence that brokerage houses steered investors to certain mutual funds because of payments they received from fund companies or their investment advisers as part of sales agreements***.
>
> Officials said the agency has opened investigations into eight brokerage houses and a dozen mutual funds that engaged in a longstanding practice known as "revenue sharing."  Agency officials said they expect that number to increase as its probe expands.  They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales and as much as 0.25% of assets that remained invested in the fund.  [. . .]
>
> ***People familiar with the investigation say regulators are looking into examples of conflict of interest when fund companies use shareholder money to cover costs of sales agreements instead of paying the sales costs out of the firm's own pockets.  The boards of funds, too, could be subject to scrutiny for allowing shareholders' commission dollars to be used for these sales agreements.  In other cases, the SEC is investigating whether funds violated policies that require costs associated with marketing a fund to be included in a fund's so-called 12b-1 plan.***

*Id.* [emphasis added.]

60.     Since the January 14, 2004 *Wall Street Journal* article quoted directly above, Franklin has admitted that it is under investigation by the SEC, as well as other government regulators, including, but not limited to, the U.S. Attorney's Office and the NASD.  Moreover, Franklin has admitted that the SEC has revealed that it is considering bringing action against Franklin for the improper payments to brokerage houses described above.  *See* Franklin 10-Q filed for the period ending June 30, 2004 at 14-15.  The California Attorney General's Office has also indicated that it is likely to bring action against Franklin.  *See* September 15, 2004 California Attorney General's Office press release.

**Franklin's Involvement With Other Brokerage Firms**

61.     Morgan Stanley was not the only brokerage firm that accepted payments from Franklin in exchange for pushing investors into Franklin Funds.  According to a former Franklin manager employed by Franklin during the Class Period, Franklin also made "shelf-space" payments to major brokerages houses such as Merrill Lynch and Smith Barney.  In addition, this former Franklin manager participated in conference calls where "shelf-space" payments were specifically discussed with Franklin national sales managers.

62.     Additionally, in a June 2004 Salomon Smith Barney press release, Franklin was identified as paying brokers at Smith Barney to push Franklin Funds.  (*See* http://www.smithbarney.com/products_services/mutual_funds/investor_information/revenueshar e.html).  Moreover, as described in an October 1, 2004 article in the *Wall Street Journal*, Smith Barney has revealed that Franklin is among the top three fund families in terms of dollars paid to the brokerage house for "shelf-space."

63.     In addition, Franklin had a "shelf-space" deal with Wachovia Securities. Wachovia has now admitted that it "receive[s] payments from many of the companies whose

funds we sell" and identified Franklin as one of the mutual fund companies from which

Wachovia received payments. (*See* http://www.wachovia.com/files/MutualFundGuide.pdf).

**Directed Brokerage**

64.    As described above, Defendants engaged in improper directed brokerage,

whereby they promised and sent brokerage business on the trades of securities in the Franklin

Funds to satisfy their *quid pro quo* "shelf-space" arrangements with brokerages.  In actions to

date against Morgan Stanley and Massachusetts Financial Services Co., the SEC and NASD

have condemned these practices, finding that they violate the federal securities laws as well as

the rules of the NASD.

65.     According to the former employee referenced in ¶ 48, Franklin's payment for

"shelf-space" would be in the form of directed brokerage to allow the brokerage houses to

receive increased commissions for executing transactions on behalf of the Franklin Funds.

According to this former employee, such "directed brokerage" arrangements undermined the

ability to get trades made at a best execution rate for the Franklin Funds, thereby costing

Franklin/Templeton Fund investors even more money.  According to this former employee,

Franklin did not follow their prospectuses in terms of charging the appropriate fees to clients

based upon the amount purchased.

66.    Additionally, according to internal Morgan Stanley documents, Franklin made

millions of dollars in "directed brokerage" payments to Morgan Stanley during the Class Period

pursuant to the *quid pro quo* arrangements of the Morgan Stanley Shelf-Space Programs.

**Defendants Concealed Their Practices From Investors**

67.    Defendants hid their "shelf-space" practices and program agreements from

Franklin Funds investors.  Defendants concealed these practices because they knew any

recommendations to own Franklin Funds would be undermined if investors knew about the "shelf-space" arrangements.

**Defendants' "Shelf-Space" Program Created Undisclosed Conflicts of Interest**

68.     Defendants' participation in "shelf-space" programs through the means described above created undisclosed, insurmountable conflicts of interest.  For example, Defendants' participation in "shelf-space" programs at Morgan Stanley, Merrill Lynch, and Smith Barney, among others, created an atmosphere where brokers did everything they could to steer investors into Franklin Funds in order to line their own pockets with money with absolutely no concern for the well-being of the investors.  In addition, Defendants' directed brokerage as a means of paying "shelf-space" created additional conflicts of interest as creating incentives for brokers to push Franklin Funds took precedence over getting the best execution price for Franklin Funds transactions.

**THE FRANKLIN DEFENDANTS
ENGAGED IN IMPROPER CONDUCT**

**The Director Defendants Breached Their
Fiduciary Duties To Franklin Funds Investors**

69.     Mutual fund Boards of Trustees have a duty to protect investors and closely guard the fees paid to an Investment Adviser and guarantee that they are not excessive and that the Investment Adviser is acting in the best interest of the mutual fund investors.  As explained by William Donaldson, the head of the SEC, in a January 7, 2004 speech to the Mutual Funds Directors Forum:

> The board of directors of a mutual fund has significant
> responsibility to protect investors. By law, directors generally are
> responsible for the oversight of all of the operations of a mutual
> fund. In addition, under the Investment Company Act, directors are
> assigned key responsibilities, such as negotiating and evaluating
> the reasonableness of advisory and other fees, selecting the fund's

independent accountants, valuing certain securities held by the fund, and managing certain operational conflicts.

The role of fund directors is particularly critical in the mutual fund context because almost all funds are organized and operated by external money-management firms, thereby creating inherent conflicts of interest and potential for abuse.  Money-management firms operating mutual funds want to maximize their profits through fees provided by the funds, but the fees, of course, paid to these firms, reduce the returns to fund investors.

Independent directors, in particular, should serve as "independent watchdogs" guarding investors' interests — and helping to protect fund assets from uses that will be of primary benefit to management companies. These interests must be paramount, for it is the investors who own the funds and for whose sole benefit they must be operated.

http://www.sec.gov/news/speech/spch010704whd.htm.

70.     Likewise, the Investment Company Institute ("ICI"), of which Franklin is a member, recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure.  In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

*Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors.  The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.*

*In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.*

http://www.ici.org/issues/dir/bro_mf_directors.pdf.  [emphasis added.][2]

71.    Franklin Funds' public filings state that the board of directors for each Franklin

Fund is responsible for the management and supervision of each respective fund.  In this regard,

the Statement of Additional Information dated January 1, 2003 for funds offered by Templeton

Funds, Inc., which includes the Templeton Foreign Fund (the "Statement of Additional

Information" or "SAI"), is typical of the Statements of Additional Information available for other

Franklin Funds.  It states the following:

> Templeton Funds, Inc. (Company) has a board of directors.  Each
> director will serve until that person's successor is elected and
> qualified.  The board is responsible for the overall management of
> the Company, including general supervision and review of each
> Fund's investment activities.  The board, in turn, elects the officers
> of the Company who are responsible for administering the
> Company's day-to-day operations.

72.    Moreover, the Form 10-K filed on September 30, 2003 for Franklin stated, with

respect to the duties of the directors and trustees vis-à-vis the funds' investment advisers, as

follows:

> Our subsidiary investment advisers conduct investment research
> and determine which securities the U.S.-registered open-end and
> closed-end funds will purchase, hold or sell **under the supervision
> and oversight of the fund's board of trustees, directors or
> administrative managers**
>
>        \*      \*      \*
>
> In general, the management agreements for our U.S.-registered
> open-end and closed-end funds must be renewed each year, and
> must be **specifically approved annually by a vote of such funds'
> board of trustees or directors or by a vote of the holders of a
> majority of such funds' outstanding voting securities**

---

[2]    The ICI describes itself as the national association of the U.S. investment company industry.  Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts.  Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets.

*     *     *

> ***Our management personnel and the fund directors or boards of trustees regularly review the fund advisory and other administrative fee structures*** in light of fund performance, the level and range of services provided, industry conditions and other relevant factors.

[emphasis added.]  The directors or trustees of each fund are thus responsible for the review and approval of the advisory and fee agreements between the investment advisers and the Franklin Funds.

73.     The Statement of Additional Information also sets forth in greater detail the purported process by which the investment managers are approved:

> Based upon its review of [certain] material and information together with such other information as it deemed relevant, ***the board, including a majority of independent directors, concluded that continuance of the management agreement was appropriate and in the best interest of Fund shareholders.***

[Emphasis added.]

74.     In truth and in fact, however, the Franklin Funds boards of directors, *i.e.* the Director Defendants, were captive to and controlled by the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Franklin Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming the assets from Franklin Fund investors.  The Franklin Funds board members were beholden for their positions, not to Franklin Fund investors, but rather to the Investment Adviser Defendants they were supposed to oversee.  The Director Defendants served for indefinite terms at the pleasure of the Investment Adviser Defendants.

75.     To ensure that the directors were compliant, the Investment Adviser Defendants often recruited key fund directors from the ranks of Franklin or the investment adviser

companies and paid them excessive salaries for their service as directors.  For example,

Defendant Charles B. Johnson, a Director of Templeton Funds, Inc., served as Chairman of the

Board and Chief Executive Officer of Franklin during the Class Period at the same time as he

oversaw at least 130 of the Franklin Funds or the portfolios in which they invested.  Likewise,

Defendant Rupert H. Johnson, Jr. served as Vice Chairman of Franklin, Vice President and

Director of Franklin Templeton Distributors, Inc., Director of Franklin Advisers, Inc. and

Franklin Investment Advisory Services, Inc., andSenior Vice President of Franklin Advisory

Services, LLC during the Class Period at the same time as overseeing at least 110 of the Franklin

Funds or the portfolios in which they invested.

76.     In exchange for managing the Franklin Funds, the Investment Adviser Defendants

placed enormous pressure on the Director Defendants to breach their fiduciary duties by

charging the Franklin Funds numerous fees that were calculated as a percentage of assets under

management.  Franklin's very existence relied upon the collection of these fees based upon the

total amount of assets under management; as explained in Franklin's Form 10-K filed with the

SEC for fiscal year ended September 30, 2003, Franklin's "revenues depend to a large extent on

the amount of assets under management" and Franklin "earns[s] most of [its] revenues from fees

linked to the amount of assets in the accounts that [it] advise[s]."  Hence the more assets under

management – *i.e.* the more investors Franklin was able to push into its Funds through the "shelf-

space" arrangements described above – the better the outlook for Franklin.  As stated in its

September 30, 2003 10-K:

> Investment management fees, our most substantial source of
> revenue, are based upon the dollars value of assets under
> management….If management agreements representing a
> significant portion of our assets under management were
> terminated, it would have a material adverse impact on our
> Company.

77.     Plaintiffs and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using directed brokerage, commissions, and so-called 12b-1 fees to improperly siphon investor assets that were directed to brokers pursuant to the "shelf-space" agreements discussed above.

**The Investment Adviser Defendants Used**
**<u>Rule 12b-1 Marketing Fees For Improper Purposes</u>**

78.     Rule 12b-1, promulgated by the SEC pursuant to the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan and any related agreements must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made."  Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued."  The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that ***there is a reasonable likelihood that the plan will benefit the company and its shareholders.***" [emphasis added.]

79.    The exceptions to the Section 12b-1 prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors.

80.    During the Class Period, the Director Defendants authorized, and the Investment Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees. However, the purported Rule 12b-1 fees charged to Franklin Funds investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan would benefit the company and its shareholders.  On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Franklin Funds investors.  For example, despite the fact that the net asset value per share for the Templeton Capital Accumulator Fund increased during the Class Period from $370 million in 2000 to $457 million by the end of 2003, its net asset value decreased by 10% during the Class Period falling from $12.11 per share from 2000 to $10.86 at year end 2003.  Yet, during the same period, expenses charged by Defendants increased, with the ratio of expenses to net assets jumping from *1.03% in 2000 to 1.12% in 2003*.  *See also* Franklin Municipal Securities Trust Fund reflecting an increase in net assets under management from $464 million to $537 million during the Class Period, at the same time that net asset value dropped from $10.60 to $10.21 per share and the expense ratio increased from .49% to .65%.

81.    As a result of these practices, the mutual fund industry was enormously profitable *for Franklin* at the expense of Plaintiffs and other members of the Class who had invested in Franklin Funds.  In this regard, another *Forbes* article, published on September 15, 2003, stated as follows:

The average net profit margin at publicly held mutual fund firms was 18.8% last year, blowing away the 14.9% margin for the financial industry overall . . . . [f]or the most part, customers do not enjoy the benefits of the economies of scale created by having larger funds. ***Indeed, once a fund reaches a certain critical mass, the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.*** *[. . .]*

***The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%. . . .*** Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never."

[emphasis added.]

82.     Moreover, Defendants failed to act in compliance with their purported 12b-1 breakpoints -- *i.e.* reductions in 12b-1 fees -- as the assets of the funds increased. The concept of breakpoints is that as fund assets increase, certain fixed costs remain the same, thereby reducing the overall costs per investor. Despite this fact, Defendants failed to impose 12b-1 breakpoints for payments that should not have increased as the size of the Fund assets increased.

83.     This increase in fees while the net asset value plummeted, and the failure to act in compliance with purported 12b-1 breakpoints, were red flags that the Director Defendants knowingly or recklessly disregarded. If anything, the Franklin Funds' marketing efforts were creating diminishing marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. The Director Defendants ignored or failed to review written reports of the amounts expended pursuant to the Franklin Funds Rule 12b-1 Plan, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 Plan, on a quarterly basis as required and hence failed to terminate the plans and the payments made

pursuant to the Rule 12b-1 Plan, even though such payments not only harmed existing Franklin

Funds investors, but also were improperly used to induce brokers to breach their duties of loyalty

to their prospective Franklin Funds investors.

84.    Moreover, at least six classes of Franklin Funds were closed to new investors

("the Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been

used to market and distribute them.  Nevertheless, the Investment Adviser Defendants received

Rule 12b-1 fees charged to the Closed Funds.  The Closed Funds that charged such Rule 12b-1

fees are: Franklin Balance Sheet Investment Fund, Classes A, B and C; and Franklin Small Cap

Growth Fund II, Classes A, B and C.

85.    As discussed throughout this Complaint, in violation of Rule 12b-1, Defendants

made additional undisclosed payments to brokers, in the form of excessive commissions,

directed brokerage and revenue-sharing that were not disclosed or authorized by the Franklin

Funds Rule 12b-1 plan.

**The Improper Use of Excessive Commissions and Directed Brokerage Business**

86.    The Investment Adviser Defendants paid excessive commissions and directed

brokerage business to broker-dealers who steered their clients into Franklin Funds as part of a

*quid pro quo* "shelf-space" arrangements between Franklin and brokerages.  Such payments and

directed-brokerage payments were used to fund undisclosed financial incentives to further push

Franklin Funds on unwitting investors.  These incentives created an undisclosed conflict of

interest and caused brokers to steer clients to Franklin Funds regardless of the funds' investment

quality relative to other investment alternatives and to thereby breach their duties of loyalty.

Moreover, Franklin Fund net asset returns were diminished because of theses "shelf-space"

payments, thereby injuring investors of the Franklin Funds.

87.     By paying the excessive commissions and directing brokerage business to participate in "shelf-space programs," the Investment Adviser Defendants violated Section 12 of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1 plan.  Additionally, in several actions to date against brokerages and mutual funds, the SEC, the NASD and various other government regulators have made it clear that the use of excessive commissions and directed brokerage to participate in "shelf-space programs" - as Franklin has done here - are highly improper.

88.     The excessive commissions and directed brokerage business used by Franklin did not fund any services that benefited the Franklin Funds shareholders.  This practice materially harmed Plaintiffs and other members of the Class from whom the illegitimate and improper fees under the guise of so-called excessive commissions and directed brokerage business were taken.

### Improper Use of Soft Dollars

89.     Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that a fund manager shall not be deemed to have breached his fiduciary duties "solely by reason of his having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined ***in good faith*** that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added).  In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined

to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities."  The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

90.     The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor by routinely using "Soft Dollars" as excessive commissions to pay brokers to push unwitting clients into Franklin Funds.  The Investment Adviser Defendants used Soft Dollars to purportedly pay for these excessive commissions as well as overhead costs such as research but in fact, the true purpose was to compensate brokers for giving preferential treatment to Franklin Funds.   Consequently, the Investment Adviser Defendants were charging Franklin Funds investors for costs not covered by the Section 28(e) safe harbor and that were not consistent with the investment advisers' fiduciary duties.

91.     Additionally, the Franklin Funds have a practice of charging lower management fees to institutional clients than to ordinary mutual fund investors through their mutual fund holdings.  This discriminatory treatment cannot be justified by any additional services to the ordinary investor and is a further breach of fiduciary duties.  According to a former Franklin employee who worked during the Class Period as a Manager of Defined Contribution Marketing, institutional investors were charged lower management fees than individual investors.  This former employee, however, was unaware of any additional services that small investors received to justify being charged greater fees.  In addition, according to this former employee, Franklin employees were instructed to waive fees for large investors, yet this was never done for smaller investors.

**Demand on the Boards to Take Corrective Action Would Be Futile**

92.     Plaintiffs have not made any demand on the Boards of Directors (the "Boards") to institute the one derivative cause of action in this Complaint, which is Count V brought pursuant to the Investment Advisers Act.  Such demand would be a futile and useless act because the Boards are incapable of making an independent and disinterested decision for the following reasons:

93.     As alleged in detail herein, each of the Director Defendants was appointed by, and serves at the pleasure of, the Investment Adviser Defendants.  Each of the Director Defendants is controlled by and beholden to the Investment Adviser Defendants for his or her position and substantial compensation as a Director.  Although as a technical matter, the shareholders have a right to vote out the Directors, the Directors know that this is extremely unlikely if the Investment Advisers support the Directors, which they have done throughout the Class Period.  Accordingly, each of the Director Defendants is incapable of evaluating a demand independently and disinterestedly.

94.     Because of their lack of independence from the Investment Adviser Defendants, the Director Defendants wrongfully approved advisor fees, 12b-1 fees, Soft Dollars, and the materially misleading disclosures in the Franklin Prospectuses in each of the years they served as Directors.

95.     As alleged in detail herein, each of the Director Defendants knowingly participated in, approved, and/or recklessly disregarded the wrongs complained of herein.  The conduct of the Director Defendants was in breach of their fiduciary duties and could not have been an exercise of good faith business judgment.

96.     The Director Defendants allowed a course of conduct that prejudiced the Franklin Funds and investors as the Director Defendants allowed the excessive fees to be charged and shareholder investments to be used for improper purposes such as kickbacks to brokers.  The

payment of kickbacks to brokers that injured shareholders was conduct that should have been prevented by the Director Defendants, but was not.

97.    The Director Defendants also were self-interested in the improper kickbacks paid to brokers who steered their clients' assets into the Franklin Funds in order to increase the asset in the Funds.  Growth of a mutual fund is one of the keys to its survival, for if a mutual fund's assets stagnate or decrease, there is a great likelihood that the fund will be disbanded or merged with another fund.  If the mutual fund is disbanded or merged, the board members for that fund necessarily lose their positions on the fund's board as well as the compensation for sitting on the fund's board.

98.    Additionally, each of the Director Defendants received substantial payments and benefits by virtue of his or her membership on one or more Boards and his or her control of hundreds of Franklin Funds, as follows:

      a)   Defendant Ashton oversaw 133 Funds or the portfolios in which they invested and received compensation of $372,100 in 2002;

      b)   Defendant Fortunato oversaw 134 Funds or the portfolios in which they invested and received compensation of $372,941 in 2002;

      c)   Defendant Hines oversaw 27 Funds or the portfolios in which they invested and received compensation of $209,500 in 2002;

      d)   Defendant Krahmer oversaw 21 Funds or the portfolios in which they invested and received compensation $142,500 in 2002;

      e)   Defendant Macklin oversaw 133 Funds or the portfolios in which they invested and received compensation $363,512 in 2002;

      f)   Defendant Milsaps oversaw 27 Funds or the portfolios in which they invested and received compensation of $219,500 in 2002; and

      g)   Defendant Brady oversaw 62 Funds or the portfolios in which they invested and received compensation of $140,500 in 2002.

99.     Each of the Director Defendants has thus benefited from the wrongdoing herein alleged and has engaged in such conduct to preserve his or her positions of control and the benefits thereof.

100.     Each of the Director Defendants continues to serve as a Director, and the Director Defendants comprise the Boards.  Thus, in order to bring this action for breaching their fiduciary duties, the Director Defendants would be required to sue themselves and their fellow Directors with whom they have had close business and personal relationships throughout the Class Period.  Accordingly, a majority of the Boards is incapable of evaluating a demand independently and disinterestedly.

**The Prospectuses and Public Filings Were Materially False And Misleading**

101.     Defendants use a series of combined prospectuses ("Prospectuses"), whereby several Funds were covered by one Prospectus during the Class Period.  Plaintiffs and other members of the Class were entitled to, and did, receive one or more of these Prospectuses, pursuant to which the Franklin Funds shares were offered.

102.     Prospectuses are required to disclose all material facts in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

103.      Each of the Franklin Fund Prospectuses issued during the Class Period failed to adequately disclose to investors material information about the mutual funds and the fees and costs associated with them.  As seen below, each of the Franklin Prospectuses contained the same materially false and misleading statements and omissions regarding revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars.

104.   Each of the Franklin Fund Prospectuses issued during the Class Period contained substantially the same materially false and misleading omissions of key information regarding the Funds' revenue-sharing, directed brokerage, 12b-1 fees and Soft Dollars that were required to be disclosed in "easy to understand language" such that a reasonable investor could make an informed decision whether or not to invest in the Funds.

**Material Omissions Regarding Revenue Sharing**

105.   The February 1, 2003 Prospectus for the Franklin Income Fund is identical in substance to all Franklin Fund Prospectuses issued during the Class Period in that it stated as follows with respect to its description of the distribution plan and method by which it offered its shares to the public:

> Distributors and/or its affiliates may provide financial support to securities dealers that sell shares of Franklin Templeton funds. This support is based primarily on the amount of sales of fund shares and/or total assets with Franklin Templeton funds.  ***The amount of support may be affected by: total sales; net sales; levels of redemptions; the proportion of a securities dealer's sales and marketing efforts in Franklin Templeton funds; a securities dealer's support of, and participation in, Distributors' marketing programs; a securities dealer's compensation programs for its registered representatives; and the extent of a securities dealer's marketing programs relating to Franklin Templeton Investments.*** Financial support to securities dealers may be made by payments from Distributors' resources, from Distributors' retention of underwriting concessions and, in the case of funds that have Rule 12b-1 plans, from payments to Distributors under such plans.

[emphasis added.]

106.   The Prospectus is materially false and misleading in that it failed to disclose, *inter alia,* the following material and damaging adverse facts which damaged Plaintiffs and other members of the Class:

(a)    that the Investment Adviser Defendants and/or Distributor Defendants used investor assets to pay broker-dealers to satisfy bilateral *quid pro quo* arrangements with

brokerages known as "shelf-space" programs whereby the broker steered clients into Franklin Funds;

(b)     that the Investment Advisor Defendants and/or Distributor Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space" programs;

(c)     that the Investment Adviser Defendants and/or Distributor Defendants directed brokerage payments to firms that favored Franklin Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space" programs and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Franklin Funds Rule 12b-1 Plan;

(d)     that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(e)     that such revenue sharing payment created undisclosed conflicts of interest;

(f)     that the Franklin Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(g)     that any economies of scale achieved by marketing of the Franklin Funds to investors were not passed on to Franklin Funds investors; but rather, as the Franklin Funds grew, fees charged to Franklin Funds investors continued to increase; and

(h)      that the Director Defendants had abdicated their duties under the

Investment Company Act and their common law fiduciary duties, failed to monitor and supervise

the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants

were able to systematically skim millions of dollars from the investors of Franklin Funds.

### Material Omissions Regarding Directed Brokerage Business

107.    The Statement of Additional Information for the Franklin Series Mutual Fund,

Inc. dated May 1, 2003 is identical in substance to all Franklin Fund Prospectuses issued during

the Class Period in that it stated as follows with respect to Directed Brokerage:

> When placing a portfolio transaction, ***the manager seeks to obtain***
> ***prompt execution of orders at the most favorable net price.*** For
> portfolio transactions on a securities exchange, the amount of
> commission paid is negotiated between the manager and the broker
> executing the transaction. The determination and evaluation of the
> reasonableness of the brokerage commissions paid are based to a
> large degree on the professional opinions of the persons
> responsible for placement and review of the transactions. These
> opinions are based on the experience of these individuals in the
> securities industry and information available to them about the
> level of commissions being paid by other institutional investors of
> comparable size. The manager will ordinarily place orders to buy
> and sell over-the-counter securities on a principal rather than
> agency basis with a principal market maker unless the manager
> believes that trading on a principal basis will not provide best
> execution.

[emphasis added.]

108.    The above statement is materially false and misleading in that it failed to disclose

that Defendants chose brokerages to execute sales of the Funds' portfolios - and thereby directed

the commissions from the sales of the portfolios securities to these brokerages - to satisfy

negotiated  *quid pro quo* arrangements with brokerages whereby their brokers then pushed their

clients into Franklin Funds in exchange for the directed brokerage.  Additionally, the above

statement is materially false and misleading for the following reasons:

(a)      that the Investment Adviser Defendants and/or Distributor Defendants used investor assets to pay broker-dealers to satisfy bilateral arrangements with brokerages known as "shelf-space programs" whereby the broker steered clients into Franklin Funds

(b)      that these directed brokerage payments resulted in the securities or other investments that made up the investment portfolios Franklin Funds not to be traded at a best execution price;

(c)      that the Investment Advisor Defendants and/or Distributor Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(d)      that the Investment Adviser Defendants and/or Distributor Defendants directed brokerage payments to firms that favored Franklin Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space programs" and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Franklin Funds Rule 12b-1 Plan;

(e)      that the Franklin Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(f)      that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(g)      that such revenue sharing payment created undisclosed conflicts of interest;

(h)     that any economies of scale achieved by marketing of the Franklin Funds to investors were not passed on to Franklin Funds investors; but rather, as the Franklin Funds grew, fees charged to Franklin Funds investors continued to increase; and

(i)     that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendants and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the Franklin Fund investors.

**Material Omissions Regarding Soft Dollars**

109.     The Statement of Additional Information, referred to in certain of the Franklin Funds' prospectuses and available to the investor upon request, stated as follows with respect to Soft Dollars:

> The board also considers the extent to which the manager may potentially achieve economies of scale and possibly derive other ancillary benefits from Fund operations, ***including the allocation of Fund brokerage and the use of "soft" commission dollars to pay for research and other similar services***. The directors also considered the manager's profitability in comparison with available industry data.

[emphasis added.]

110.     The Prospectuses failed to disclose, *inter alia,* the following material and damaging adverse facts regarding Soft Dollars which damaged Plaintiffs and other members of the Class:

(a)     that the Investment Adviser Defendants and/or Distributor Defendants used investor assets to pay broker-dealers to satisfy bilateral *quid pro quo* "shelf-space" arrangements with brokerages whereby the broker steered their clients into Franklin Funds;

(b)      that the Investment Advisor Defendants and/or Distributor Defendants used brokerage commissions over and above those allowed by Rule 12b-1 to pay for the "shelf-space programs";

(c)      that the use of brokerage commissions to satisfy bilateral arrangements with brokers known as "shelf-space" programs violated Section 28(e) of the Exchange Act;

(d)      that the Investment Adviser Defendants and/or Distributor Defendants directed brokerage payments to firms that favored Franklin Funds to satisfy bilateral arrangements with brokerages pursuant to "shelf-space programs" and that this directed brokerage was a form of marketing that was not disclosed in or authorized by the Franklin Funds Rule 12b-1 Plan;

(e)      that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(f)      that such "shelf-space" revenue-sharing payments created undisclosed conflicts of interest;

(g)      that the Franklin Funds Rule 12b-1 Plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12 of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(h)      that any economies of scale achieved by marketing of the Franklin Funds to investors were not passed on to Franklin Funds investors; but rather, as the Franklin Funds grew, fees charged to Franklin Funds investors continued to increase; and

(i)      that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, failed to monitor and supervise the Investment Adviser Defendant and, as a consequence, the Investment Adviser Defendants were able to systematically skim millions of dollars from the assets for Franklin Funds investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring these claims (except for Count V which is brought derivatively on behalf of the Franklin Funds) as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who held shares, units, or like interests in any of the Franklin Funds between March 2, 1999 and November 17, 2003, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

112.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Franklin Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

114.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

115.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Investment Company Act was violated by Defendants' acts as alleged herein;

(b)    whether the Investment Advisers Act was violated by Defendants' acts as alleged herein;

(c)    whether the New Jersey Consumer Fraud Act was violated by Defendants' acts as alleged herein;

(d)    whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(e)    whether Defendants omitted to disclose to the investing public during the Class Period material facts about the business, operations, and financial statements of the Franklin Funds; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

116.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## INVESTMENT COMPANY ACT CLAIMS

### COUNT I

### AGAINST THE INVESTMENT ADVISER DEFENDANTS AND DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

117.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

118.    This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Franklin Funds and against the Director Defendants for their role in the creation of the materially false and misleading Prospectuses.

119.    The Investment Adviser Defendants and Director Defendants omitted to state facts necessary to prevent statements in registration statements and reports filed and disseminated pursuant to the Investment Company Act, in light of the circumstances under which they were made, from being materially false and misleading.  The Investment Adviser Defendants and Director Defendants failed to disclose the following:

(a)    that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services known as "shelf-space" and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendants and/or the Distributor Defendants compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements;

(c)     that the Investment Adviser Defendants and/or the Distributor Defendants directed brokerage payments to firms that favored Franklin Funds, which constituted a form of marketing that was not disclosed in or authorized by the Franklin Funds Rule 12b-1 Plan;

(d)     that the Franklin Funds Rule 12b-1 Plan was not in compliance with Rule 12b-1, and that payments made pursuant to the plan were in violation of Section 12(b) of the Investment Company Act because, among other reasons, the plan was not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plan would benefit the company and its shareholders;

(e)     that by paying brokers to aggressively steer their clients to Franklin Funds, the Investment Adviser Defendants and/or the Distributor Defendants were knowingly and/or recklessly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(f)     that any economies of scale achieved by marketing of the Franklin Funds to new investors were not passed on to Franklin Funds investors; on the contrary, as the Franklin Funds grew, fees charged to Franklin Funds investors continued to increase;

(g)     that Defendants improperly used Soft Dollars and excessive commissions, paid from Franklin Fund investors' assets, to pay for overhead expenses the cost of which should have been borne by Franklin and not Franklin Funds investors; and

(h)     that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Franklin Fund investors.

120.    By reason of the conduct described above, the Investment Adviser Defendants and the Director Defendants violated Section 34(b) of the Investment Company Act.

121.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' and Director Defendants' violation of Section 34(b) of the Investment Company Act, Franklin Funds investors have incurred damages.

122.    Plaintiffs and other members of the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act.  Such injuries were suffered directly by shareholders, rather than by the Franklin Funds themselves.

123.    The Investment Adviser Defendants and Director Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### AGAINST THE DISTRIBUTOR DEFENDANTS, THE INVESTMENT ADVISER DEFENDANTS AND THE DIRECTOR DEFENDANTS PURSUANT TO SECTION 36(a) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

124.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

125.    This Count is brought against the Distributor Defendants, the Investment Adviser Defendants and the Director Defendants for breach of their fiduciary duties as defined by Section 36(a) of the Investment Company Act.

126.    The Distributor Defendants, the Investment Adviser Defendants and the Director Defendants had a fiduciary duty to the Class.

127.    The Distributor Defendants, the Investment Adviser Defendants and the Director Defendants violated Section 36(a) by improperly charging investors in the Franklin Funds

purported Rule 12b-1 marketing fees, and by drawing on assets of Franklin Funds investors to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

128.    By reason of the conduct described above, the Distributor Defendants, the Investment Adviser Defendants and the Director Defendants violated Section 36(a) of the Investment Company Act.

129.    As a direct, proximate and foreseeable result of the Distributor Defendants', the Investment Adviser Defendants' and the Director Defendants' breaches of fiduciary duties in their roles as principal underwriter, investment advisers, and directors and officers, respectively, to Franklin Funds investors, the Class has incurred millions of dollars in damages.

130.    Plaintiffs, in this count, seek to enjoin Defendants from engaging in such practices in the future as well as recover improper Rule 12b-1 fees, Soft Dollars, excessive commissions, directed brokerage, directors' compensation and the management fees charged the Franklin Funds by the Distributor Defendants, the Investment Adviser Defendants and the Director Defendants.

## COUNT III

### AGAINST THE DISTRIBUTOR DEFENDANTS, THE INVESTMENT ADVISER DEFENDANTS AND THE DIRECTOR DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT ON BEHALF OF THE CLASS

131.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporates the allegations contained above.

132.    This Count is brought by the Class against the Distributor Defendants, the Investment Adviser Defendants and the Director Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

133.    The Distributor Defendants, the Investment Adviser Defendants, and the Director Defendants had a fiduciary duty to the Franklin Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Distributor Defendants, the Investment Adviser Defendants, and the Director Defendants.

134.    The Distributor Defendants, the Investment Adviser Defendants, and the Director Defendants violated Section 36(b) by improperly charging investors in the Franklin Funds purported Rule 12b-1 marketing fees, and by drawing on the assets of Franklin Funds investors to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

135.    By reason of the conduct described above, the Distributor Defendants, the Investment Adviser Defendants, and the Director Defendants violated Sections 36(b) of the Investment Company Act.

136.    The Director Defendants received improper payments, in that they received their compensation despite the fact they violated their fiduciary duties.

137.    As a direct, proximate and foreseeable result of the Distributor Defendants', the Investment Adviser Defendants' and the Director Defendants' breach of their fiduciary duties in their role as principal underwriter, investment advisers, and directors and officers, respectively, the Class has incurred millions of dollars in damages.

138.    Plaintiffs, in this count, seek to recover the Rule 12b-1 fees, Soft Dollars, excessive commissions and the management fees charged the Franklin Funds by the Distributor Defendants, the Investment Adviser Defendants, and the Director Defendants.

## COUNT IV

**AGAINST FRANKLIN (AS CONTROL PERSON OF THE DISTRIBUTOR
DEFENDANTS AND THE INVESTMENT ADVISER DEFENDANTS)
FOR VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT
ON BEHALF OF THE CLASS**

139.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

140.    This Count is brought pursuant to Section 48(a) of the Investment Company Act

against Franklin as control person of the Distributor Defendants and the Investment Adviser

Defendants who caused the Investment Adviser Defendants to commit the violations of the

Investment Company Act alleged herein.

141.    The Distributor Defendants are liable under Sections 34(b), 36(a) and 36(b) of the

Investment Company Act to the Franklin Funds as set forth herein.

142.    The Investment Adviser Defendants are liable under Sections 34(b), 36(a) and

36(b) of the Investment Company Act as set forth herein.

143.    Franklin was a "control person" of the Distributor Defendants and the Investment

Adviser Defendants and caused the violations complained of herein.  By virtue of its position of

operational control and/or authority over the Investment Adviser Defendants and/or Distributor

Defendants – Franklin, directly and indirectly, had the power and authority, and exercised the

same, to cause the Distributor Defendants and/or the Investment Adviser Defendants to engage

in the wrongful conduct complained of herein.

144.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the

foregoing, Franklin is liable to Plaintiffs to the same extent as are the Distributor Defendants and

the Investment Adviser Defendants for their primary violations of Sections 34(b), 36(a) and

36(b) of the Investment Company Act.

145.    By virtue of the foregoing, The Franklin Funds, Plaintiffs and other Class members are entitled to damages against Franklin.

## INVESTMENT ADVISER ACT CLAIMS

### COUNT V

**AGAINST THE INVESTMENT ADVISER DEFENDANTS UNDER SECTION 215 OF THE INVESTMENT ADVISERS ACT FOR VIOLATIONS OF SECTION 206 OF THE INVESTMENT ADVISERS ACT DERIVATIVELY ON BEHALF OF THE FRANKLIN FUNDS**

146.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

147.    This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

148.    The Investment Adviser Defendants had advisory contracts with the Franklin Funds and served as "investment advisers" to the Franklin Funds and other members of the Class pursuant to the Investment Advisers Act.  The Franklin Funds, and their shareholders, were the intended beneficiaries of these advisory contracts and investment advisor services.

149.    As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Franklin Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

150.    During the Class Period, the Investment Adviser Defendants breached their fiduciary duties to the Franklin Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Franklin Funds.  The Investment Adviser Defendants breached their fiduciary duties owed to the Franklin

Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon the Franklin Funds. The Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein.  The Investment Adviser Defendants, because of their position of authority and control over the Franklin Funds were able to and did control the fees charged and collected, and otherwise control the operations of the Franklin Funds.

151.    The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Franklin Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Franklin Funds.  The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Franklin Funds from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including:  (1) the charging of improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" in exchange for "shelf-space"; and (4) charging excessive and improper commission payments used to pay off brokers.

152.    As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Franklin Funds, the Franklin Funds were damaged.

153.     The Franklin Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## NEW JERSEY CONSUMER FRAUD CLAIM

## COUNT VI

### AGAINST ALL DEFENDANTS FOR VIOLATION OF THE
### NEW JERSEY CONSUMER FRAUD ACT ON BEHALF OF THE CLASS

154.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

155.    In violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and particularly N.J.S.A. 56:8-2, all defendants used and employed unconscionable commercial practices, deception, fraud, misrepresentations, and/or the knowing concealment, suppression and/or omission of material facts with the intent that others rely thereon, in its marketing, distribution, sale and advertisement of the Franklin Funds.  Specifically, defendants misrepresented, expressly and/or by implication, and/or intentionally omitted to state material facts regarding, and engaged in the unconscionable commercial practice, deception and fraud of, the excessive and improper fees charged in connection with the Franklin Funds and the "shelf-space programs" whereby Defendants paid kickbacks to brokers to push Franklin Funds.

156.    Plaintiffs and the other members of the Class suffered an ascertainable loss of money as a result of Defendants' use or employment of these unfair methods of competition and unfair or deceptive acts or practices.

157.    By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to damages against all Defendants.

## BREACH OF FIDUCIARY DUTY CLAIMS

### COUNT VII

#### BREACH OF FIDUCIARY DUTY AGAINST
#### THE INVESTMENT ADVISER DEFENDANTS ON BEHALF OF THE CLASS

158.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

159.    As advisers to the Franklin Funds that were made up of Plaintiffs' and other Class members' investments, the Investment Adviser Defendants were fiduciaries to the Plaintiffs and other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

160.    As set forth above, the Investment Adviser Defendants breached their fiduciary duties to Plaintiffs and the Class.

161.    Plaintiffs and the Class have been specifically injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

162.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

### COUNT VIII

#### BREACH OF FIDUCIARY DUTY AGAINST
#### THE DIRECTOR DEFENDANTS ON BEHALF OF THE CLASS

163.    Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

164.     As Franklin Funds directors, the Director Defendants had a fiduciary duty to the Franklin Funds and Franklin Funds investors to supervise and monitor the Investment Adviser Defendants.

165.     The Director Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" in exchange for "shelf-space"; and (4) charging excessive and improper commission payments to brokers.

166.     Plaintiffs and the Class have been specifically injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

167.     Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT IX

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS ON BEHALF OF THE CLASS

168.     Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

169.     At all relevant times herein, the brokerages, such as Morgan Stanley, Smith Barney, and Wachovia, among others, that sold Franklin Funds had fiduciary duties of loyalty to their clients, including Plaintiffs and other members of the Class.

170.     Defendants knew or should have known that the brokerages had these fiduciary duties.

171.     By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions from Franklin in exchange for aggressively pushing Franklin Funds, and by failing to disclose the receipt of such fees, the brokerages breached their fiduciary duties to Plaintiffs and the other members of the Class.

172.     Defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless perpetrated the fraudulent scheme alleged herein.

173.     Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiffs and the other members of the Class.  By participating in the brokerages' breaches of fiduciary duties, Defendants are liable therefor.

174.     As a direct, proximate and foreseeable result of Defendants' knowing participation in the brokerages' breach of fiduciary duties, Plaintiffs and the Class have suffered damages.

175.     Because Defendants acted with reckless and willful disregard for the rights of Plaintiffs and other members of the Class, Defendants are liable for punitive damages in an amount to be determined by the jury.

**UNJUST ENRICHMENT CLAIMS**

**COUNT X**

**AGAINST ALL DEFENDANTS FOR
UNJUST ENRICHMENT ON BEHALF OF THE CLASS**

176.     Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

177.    Defendants have benefited from their unlawful acts through the excessive and improper fees they charged and received from Plaintiffs and the other members of the Class.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and the other members of the Class and retained by Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding the Franklin Funds rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

E.    Ordering an accounting of all Franklin Fund related fees, commissions, directed brokerage and Soft Dollar payments;

F.    Ordering restitution of all unlawfully or discriminatorily-obtained fees and charges;

G.    Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to

attach, impound or otherwise restrict the Defendants' assets to assure that Plaintiffs and the Class have an effective remedy;

H.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

I.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

## NOTICE TO ATTORNEY GENERAL

Notice of this action has been given to the Attorney General of the State of New Jersey in accordance with N.J.S.A. 56:8-20.

Dated: October 4, 2004

**SHALOV STONE & BONNER LLP**


By:   s/ Patrick L. Rocco
        Patrick L. Rocco
Jennifer A. Sullivan
163 Madison Avenue, P.O. Box 1277
Morristown, New Jersey  07962-1277
(973) 775-8997

*Liaison Counsel for Plaintiffs and the Class*

**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
Jerome M. Congress
Janine L. Pollack
Michael R. Reese
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

*Lead Counsel for Plaintiffs and the Class*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland  21202
(410) 332-0030

**MURRAY, FRANK & SAILER LLP**
Marvin L. Frank
Eric J. Belfi
 275 Madison Avenue
New York, New York  10016
(212) 682-1818

**GLANCY BINKOW & GOLDBERG LLP**
Michael M. Goldberg
1801 Avenue of the Stars
Suite 311
Los Angeles, California  90067
(310) 201-9150

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

**LITE DePALMA GREENBERG &**
  **RIVAS, LLC**
Joseph J. DePalma (JD 7697)
2 Gateway Center, 12 th Floor
Newark, New Jersey  07102
(973) 623-3000

***Additional Counsel for Plaintiffs***